1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

JOSE TREJO, individually and as
successor in interest to JOSE
BANDA PICHARDO, et al.,

12
13

Plaintiffs,

14

v.

15

COUNTY OF IMPERIAL, et al.,

16

Defendants.

17
18
19
20

Case No.: 20-cv-1465-LAB-DDL

**ORDER:**

**1) GRANTING IN PART AND
DENYING IN PART MOTION
TO DISMISS THIRD
AMENDED COMPLAINT,
[Dkt. 112]; and**

**2) DENYING MOTION TO
STRIKE PORTIONS OF
THIRD AMENDED
COMPLAINT, [Dkt. 110]**

21      Plaintiffs Jose Trejo and Susan Banda (collectively, "Plaintiffs") commenced

22 this action individually and as successors in interest to their deceased son, Jose

23 Banda Pichardo. In their Third Amended Complaint ("TAC"), they bring claims

24 against Defendants County of Imperial (the "County"), Sheriff Raymond Loera,

25 and California Forensic Medical Group ("CFMG") (collectively, "Defendants"),

26 alleging that, as a result of Defendants' negligence and deliberate indifference to

27 Pichardo's mental health needs, Defendants are responsible for Pichardo's death

28 while he was in custody at the Imperial County Regional Adult Detention Facility

("ICRADF"). The TAC asserts claims for violations of Pichardo's and their own Fourteenth Amendment rights, negligence under common law and California Government Code § 845.6, and wrongful death.

CFMG now moves to strike portions of the TAC. (Dkt. 110). For their part, the County and Loera (collectively, "County Defendants") separately move to dismiss portions of the TAC, specifically the single claim brought against Loera and the *Monell* claim brought against the County. (Dkt. 112). Having considered the parties' submissions and the relevant law, the Court **DENIES** CFMG's motion to strike, (Dkt. 110), and **GRANTS IN PART** and **DENIES IN PART** County Defendants' motion to dismiss, (Dkt. 112). The Court **DISMISSES WITH PREJUDICE** all claims as against Loera.

## I.    BACKGROUND

The TAC's relevant factual allegations and the reasonable inferences that can be drawn in Plaintiffs' favor are as follows. Pichardo suffered from, and had been diagnosed with, depression, bipolar disorder, anxiety, and schizophrenia. (Dkt. 107, TAC ¶ 16). He was on a regimen of various prescription medications for these conditions when he was arrested on October 27, 2018. (*Id.* ¶¶ 17).

Pichardo was booked into ICRADF on the day he was arrested. (*Id.* ¶ 14). At ICRADF, Pichardo was in the County's custody and subject to policies issued by Loera, the Sheriff of Imperial County. (*See id.* ¶ 8). As part of the booking process, Pichardo underwent a preliminary medical and psychological screening. (*Id.* ¶ 15). The TAC doesn't expressly state whether Pichardo disclosed his mental illnesses during this screening, but it's reasonable to infer that he did. After booking, Pichardo "was refused his medication and was placed in the general population without any designation regarding his medical condition that would alert those in charge of his care that he required monitoring, medical treatment, psychological treatment, and follow-up care." (*Id.* ¶ 18).

At some point after entering the County's custody, Pichardo noticed his

1  mental health was deteriorating and asked Trejo to bring his medications to

2  ICRADF. (*Id.* ¶ 19). On November 8, 2018, deputies at ICRADF refused Trejo's

3  request to bring Pichardo his medications. (*Id.* ¶ 20). On November 30, 2018, after

4  his father was turned away, Pichardo submitted a request to be seen by ICRADF

5  medical staff. (*Id.* ¶ 22). In his request, Pichardo complained that "I can't sleep

6  and my anxiety is getting worse . . . I find myself talking to myself a lot." (*Id.*).

7  Pichardo was scheduled for an appointment with a medical staff on December 3,

8  2018, but that appointment was rescheduled. (*Id.*). Pichardo eventually was seen

9  by ICRADF medical staff, (*see id.* ¶¶ 23, 37–38), but six subsequent appointments

10  were rescheduled between December 5, 2018 and January 29, 2019 due to time

11  constraints, (*see id.* ¶¶ 24, 30, 35, 36, 41), or staffing issues, (*id.* ¶ 29).

12       From the date of his arrest to his death, Pichardo reported worsening

13  symptoms, including hearing voices in his head that interfered with his sleep and

14  eating. (*See id.* ¶¶ 25, 28, 34). Other inmates reported that Pichardo started to

15  engage in concerning behaviors, including: "doing weird shit like wiping his ass

16  with his own hand," (*id.* ¶ 54); "'palming' his medication (i.e., placing it in his hand

17  and not swallowing it)," (*id.* ¶ 55); "walk[ing] naked to a pay phone, pick[ing] up

18  the receiver and . . . speaking gibberish into the phone, having a conversation with

19  himself for hours," (*id.* ¶ 56); getting "butt-naked and get[ting] on his knees and

20  pray[ing] and then go[ing to] look over the balcony like he was about to jump over,"

21  (*id.* ¶¶ 58, 59); and making a noose out of his bedsheets, (*id.* ¶ 61). By January

22  25, 2019, Pichardo's condition had lost so much weight that other inmates were

23  attempting to feed him. (*See id.* ¶ 40). These inmates reported their observations

24  to correctional officers. (*Id.* ¶ 62). On or about February 23, 2019, Pichardo died

25  of suicide by hanging himself in his cell. (*Id.* ¶¶ 50–51).

26       Plaintiffs commenced this action on July 29, 2020. (Dkt. 1). On February 15,

27  2023, the Court granted in part and denied in part County Defendants' motion for

28  judgment on the pleadings, and dismissed all claims against Loera and the *Monell*

1   claims against the County. (Dkt. 106). The Court gave Plaintiffs leave to to file a

2   TAC to address the deficiencies identified in the Second Amended Complaint, (*id.*

3   at 15), which Plaintiffs filed on February 28, 2023. (*See* Dkt. 107 (TAC), 108

4   (redlined TAC)). CFMG moves to strike portions of the TAC, (Dkt. 110), and

5   County Defendants move to dismiss portions of the TAC. (Dkt. 112).

6   **II.    RULE 12(f) MOTION TO STRIKE**

7           Under Rule 12(f), a court may strike "any redundant, immaterial, impertinent

8   or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally

9   disfavored. *RDF Media Ltd. v. Fox Broadcasting Co.*, 372 F. Supp. 2d 556, 561

10  (C.D. Cal. 2005). However, "[a] motion to strike should be granted if it will eliminate

11  serious risks of prejudice to the moving party, delay, or confusion of issues." *Lee*

12  *v. Hertz Corp.*, 330 F.R.D. 557, 560 (N.D. Cal. 2019) (citing *Fantasy, Inc. v.*

13  *Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S.

14  517 (1994)). When ruling on a motion to strike, the court must accept all of the

15  non-moving party's allegations as true and construe the pleading in the light most

16  favorable to the non-movant. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp.

17  2d 1128, 1140 (N.D. Cal. 2010).

18          CFMG moves to dismiss the following ninety-two paragraphs and

19  subparagraphs of the TAC (as listed in Dkt. 108): 11 at lines 21–27; 21–27; 29;

20  30; 31; 33; 34 at lines 15–17; 35–39; 41; 42; 44–49; 52–55; 58; 59; 63–65; 67–71;

21  78; 81–87; 89–91(e); 94–100; 101 to the extent it includes by reference the prior

22  enumerated paragraphs; 102 to the extent it includes by reference the prior

23  enumerated paragraphs at line 25; 120–20(b); 120(e)–(h); 120(i)(ii)–(i)(iii); 120(j);

24  120(k) to the extent it includes by reference prior enumerated paragraphs at line 7;

25  121; 122; and 125, 131, and 138 to the extent they include by reference prior

26  enumerated paragraphs. (Dkt. 110 at 5–6). CFMG argues these new or revised

27  allegations should be stricken because they exceed the scope of leave to amend

28  and unfairly prejudice CFMG by allowing new allegations that, in CFMG's view,

1  amount to new claims of relief for alleged constitutional violations. (*Id.* at 8).

2  The Court's February 15 Order granted Plaintiffs leave to amend their
3  complaint to address the deficiencies identified in the SAC's claims against Loera
4  and the *Monell* claims against the County. (Dkt. 106 at 15). CFMG asserts that
5  "[n]owhere in the Court's Order does it give permission to Plaintiffs to amend their
6  Complaint to allege additional facts or make additional claims against or involving
7  CFMG." (Dkt. 110 at 5 (citations omitted)). This characterization misunderstands
8  how Plaintiffs' new allegations about CFMG's conduct might help establish a
9  *Monell* claim. The County has a constitutional duty to provide adequate medical
10 and psychiatric care to individuals in its custody. *See Gibson v. County of*
11 *Washoe*, 290 F.3d 1175, 1187–88 & n.9 (9th Cir. 2002), *overruled on other*
12 *grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)
13 (en banc). And the County remains liable for violations of that duty even if the
14 medical services in its jails are provided by a contractor like CFMG. *See West v.*
15 *Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not
16 relieve the [County] of its constitutional duty to provide adequate medical
17 treatment to those in its custody."). The TAC's new allegations related to CFMG's
18 provision of medical care at ICRADF might help Plaintiffs make out a *Monell* claim
19 against the County and, therefore, are permissible amendments to the complaint.
20 Additionally, contrary to CFMG's assertions, the TAC only asserts state law
21 causes of action of negligence and wrongful death against CFMG—the same two
22 state law causes of action brought against CFMG in the Second Amended
23 Complaint. (*See* TAC ¶¶ 125–30 (negligence), 138–44 (wrongful death)). Having
24 reviewed the paragraphs of the TAC CFMG objects to, the Court finds that they
25 are all within the scope of leave to amend.

26 Even if the Court accepts CFMG's argument that Plaintiffs exceeded the
27 scope of leave to amend, "[e]xceeding the scope of a court's leave to amend is
28 not necessarily sufficient grounds for striking a pleading or portions thereof."

20-cv-1465-LAB-DDL

1    *Walsh v. SL One Glob., Inc.*, No. 2:22-cv-583-WBS-DB, 2022 WL 17722964, at *1

2    (E.D. Cal. Dec. 15, 2022) (quoting *Beavers v. New Penn Fin. LLC*, No. 1:17-cv-

3    747 JLT, 2018 WL 385421, at *3 (E.D. Cal. Jan. 11, 2018)) (collecting cases); *see*

4    *also Vahora v. Valley Diagnostics Lab'y Inc.*, No. 1:16-CV-01624-SKO, 2017 WL

5    2572440, at *4 (E.D. Cal. June 14, 2017) (quoting *Manzano v. Metlife Bank N.A.*,

6    No. CIV. 2:11-651 WBS DAD, 2011 WL 2080249, at *3 (E.D. Cal. May 25, 2011))

7    ("'[T]he court may choose not to strike the pleading in the interests of judicial

8    economy' even 'when a pleading is improperly filed.'"). *But see Marcus & Millichap*

9    *Real Est. Inv. Servs. of Nev., Inc. v. Decker*, 400 F. Supp. 3d 1074, 1085 (D. Nev.

10   2019), *rev'd and remanded on other grounds sub nom. Marcus & Millichap Real*

11   *Est. Inv. Servs. of Nev., Inc. v. Chandra*, 822 F. App'x 597 (9th Cir. 2020) (striking

12   unrelated facts and a previously dismissed cause of action for exceeding the

13   scope of leave to amend).

14          CFMG also contends the Court should strike the objected to paragraphs

15   because they "impose[] an undue burden, and unfair prejudice [on] CFMG and

16   would consume a substantial expenditure of both the parties' and judicial time and

17   resources." (Dkt. 110 at 8). These arguments are unpersuasive. First, fact and

18   expert discovery has already been completed in the case, and CFMG had a full

19   and fair opportunity to litigate the newly added allegations, especially those

20   discovered through depositions, all of which were attended or defended by

21   CFMG's counsel. (*See* Dkt. 117 at 25). Second, as discussed above, the TAC

22   doesn't allege any new claims against CFMG. Third, CFMG has the opportunity

23   to continue to defend itself, including by moving to exclude evidence at the

24   summary judgment phase or before a trial. Based on these considerations, the

25   Court finds CFMG isn't prejudiced by the TAC's newly added allegations. While it

26   might preserve judicial time and resources to strike the objected to paragraphs,

27   those interests don't justify striking new allegations which are within the scope of

28   leave to amend. *See, e.g.*, *Manzano*, 2011 WL 2080249, at *3 ("[T]he court may

1   choose not to strike the pleading in the interests of judicial economy.").

2       For the foregoing reasons, CFMG's motion to strike is **DENIED**.

3   **III.   RULE 12(b)(6) MOTION TO DISMISS**

4       **A.   Legal Standard**

5       A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint.
6   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to
7   dismiss, a complaint must contain sufficient factual matter, accepted as true, to
8   'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,
9   678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim
10  is plausible if the factual allegations supporting it permit "the court to draw the
11  reasonable inference that the defendant is liable for the misconduct alleged." *Id.*
12  The factual allegations need not be detailed; instead, the plaintiff must plead
13  sufficient facts that, if true, "raise a right to relief above the speculative level."
14  *Twombly*, 550 U.S. at 545. The plausibility standard isn't a "'probability
15  requirement,' but it asks for more than a sheer possibility that a defendant has
16  acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).
17  Courts aren't required to accept legal conclusions couched as factual allegations
18  and "formulaic recitation[s] of the elements of a cause of action" aren't sufficient.
19  *Twombly*, 550 U.S. at 555. The Court accepts as true all facts alleged in the
20  complaint and draws all reasonable inferences in favor of the plaintiff. *Davis v.*
21  *HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1159 (9th Cir. 2012). Ultimately, a court
22  must determine whether the plaintiff's alleged facts, if proven, permit the court to
23  grant the requested relief. *See Iqbal*, 556 U.S. at 666; Fed. R. Civ. P. 8(a)(2).

24      **B.   Supervisory Liability (Claim 1)**

25      The TAC's first claim asserts a supervisory liability claim against Loera in
26  his individual capacity, alleging he failed to adequately train employees. County
27  Defendants argue Loera is entitled to qualified immunity and that the TAC fails to
28  state a claim against Loera. The Court first considers whether Loera is entitled to

20-cv-1465-LAB-DDL

1  qualified immunity.

2      County Defendants argue that because the TAC fails to make specific

3  allegations regarding Loera's personal conduct, he is entitled qualified immunity.

4  "The doctrine of qualified immunity protects government officials 'from liability for

5  civil damages insofar as their conduct does not violate clearly established

6  statutory or constitutional rights of which a reasonable person would have

7  known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

8  *Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "protects 'all but the

9  plainly incompetent or those who knowingly violate the law.'" *District of Columbia*

10 *v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341

11 (1986)). On a motion to dismiss, officers are entitled to qualified immunity under

12 § 1983 unless the complaint sufficiently alleges that "(1) they violated a federal

13 statutory or constitutional right, and (2) the unlawfulness of their conduct was

14 'clearly established at the time.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658,

15 664 (2012)); *see also Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018)

16 ("[W]hen a district court dismisses a complaint for failure to state a claim based

17 on a qualified immunity defense, we consider whether the complaint alleges

18 sufficient facts, taken as true, to support the claim that the officials' conduct

19 violated clearly established constitutional rights of which a reasonable officer

20 would be aware."). Courts may choose which prong to address first. *Pearson*, 555

21 U.S. at 236.

22      "Once the official pleads qualified immunity, the burden is on the plaintiff to

23 prove two elements: (1) that the right was violated; and (2) that the right was

24 clearly established at the time of the alleged misconduct." *Isayeva v. Sacramento*

25 *Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017). "A clearly established right is

26 one that is 'sufficiently clear that every reasonable official would have understood

27 that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)

28 (quoting *Reichle*, 566 U.S. at 664). To determine whether an officer is entitled to

20-cv-1465-LAB-DDL

1  qualified immunity, courts must look to the particular circumstances of the case

2  and "not . . . define clearly established law at a high level of generality." *City &*

3  *County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015).

4       In its February 15 Order, the Court found that Loera was entitled to qualified

5  immunity on claims against him because Plaintiffs didn't meet their burden of

6  showing that he violated a right that was clearly established. (*See* Dkt. 106

7  at 4–7). Having reviewed the TAC, the same result must follow here. The TAC's

8  newly added factual allegations continue to group Loera with the other Defendants

9  and don't specifically identify Loera's personal conduct. (*See* TAC at 13, 18,

10 ¶¶ 86, 89, 100). Similarly, the revised allegations in the TAC's first claim are

11 generalized and conclusory. (*See id.* ¶¶ 102–04, 106, 108). For example, the TAC

12 alleges Loera "acted with deliberate indifference to his responsibili[ties] and

13 dut[ies]" to Pichardo by: (1) "failing to supervise his subordinates"; (2) failing "to

14 take adequate measure [sic] to protect inmates"; (3) failing to "implement[ and

15 enforce] policies and procedures" which would ensure supervision and protection

16 of inmates; (4) failing to "train and ensure that deputies, employees and medical

17 care providers provide reasonable security and monitoring of inmates"; and

18 (5) failing to "provide prompt and competent access and delivery of mental health

19 attention and intervention when inmates, such as PICHARDO, were having a

20 mental health crisis requiring prompt intervention." (*Id.* ¶ 102). These allegations

21 fail to identify any circumstance in which Loera acted individually or failed to act.

22 As in with the SAC, such generalized allegations aren't sufficient to plausibly

23 allege that Loera's conduct violated Pichardo or Plaintiffs' rights. *Cf. Keates*, 883

24 F.3d at 1238–39 (holding an officer wasn't entitled to qualified immunity on a

25 motion to dismiss when the complaint contained allegations about the officer's

26 individual actions). Because the TAC doesn't allege conduct specific to Loera, the

27 Court doesn't need to consider whether Pichardo or Plaintiffs' rights were clearly

28 established. *See Isayeva*, 872 F.3d at 946.

1    The Court finds Loera is entitled to qualified immunity. County Defendants'

2    motion is **GRANTED** as to the claim against Loera, and that claim is **DISMISSED**

3    **WITH PREJUDICE**. Because it is clear that any further amendment here would

4    be futile, the claim is **DISMISSED WITHOUT LEAVE TO AMEND**. *See DeSoto v.*

5    *Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).

6    **C.    *Monell* Liability (Claim 2)**

7    The TAC's second claim asserts *Monell* liability against the County under

8    § 1983. (TAC ¶¶ 109–124); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658

9    (1978). Municipalities and local governments may not be held liable under § 1983

10    unless a policy, practice, or custom of the government is the moving force behind

11    a violation of constitutional rights. *Monell*, 436 U.S at 694. To establish liability for

12    a local government under *Monell*, a plaintiff must show: (1) he was deprived of a

13    constitutional right; (2) the government had a policy or custom; (3) the policy or

14    custom amounts to deliberate indifference to the plaintiff's constitutional right; and

15    (4) "the policy [was] the moving force behind the constitutional violation." *Gordon*

16    *v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City*

17    *of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). A plaintiff can satisfy *Monell's* policy

18    requirement in one of three ways. First, a local government can be held liable

19    when it acts pursuant to an official policy. *Id.* Second, a local government can be

20    "held liable for a 'longstanding practice or custom.'" *Id.* (quoting *Thomas v. County*

21    *of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)). Third, a local government can

22    be held liable when "'the individual who committed the constitutional tort was an

23    official with final policy-making authority' or such an official 'ratified a subordinate's

24    unconstitutional decision or action and the basis for it.'" *Id.* at 974 (quoting

25    *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010),

26    *overruled on other grounds by Castro*, 833 F.3d at 1070)).

27    A government policy is "a deliberate choice to follow a course of action . . .

28    by the official or officials responsible for establishing final policy with respect to

1   the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483

2   (1986). A local government "may [also] be liable if it has a 'policy of inaction and

3   such inaction amounts to a failure to protect constitutional rights.'" *Lee v. City of*

4   *Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v. Pearce*, 954

5   F.2d 1470, 1474 (9th Cir. 1992)). However, "[l]iability for improper custom may not

6   be predicated on isolated or sporadic incidents; it must be founded upon practices

7   of sufficient duration, frequency and consistency that the conduct has become a

8   traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918

9   (9th Cir. 1996); *see also Oyenik v. Corizon Health Inc.*, 696 F. App'x 792, 794

10  (9th Cir. 2017) ("While one or two incidents are insufficient to establish a custom

11  or policy, we have not established what number of similar incidents would be

12  sufficient to constitute a custom or policy.") (internal citations omitted).

13       A local government's failure to train its employees may also create § 1983

14  liability when the "failure to train amounts to deliberate indifference to the rights of

15  persons with whom the [employees] come into contact." *City of Canton v. Harris*,

16  489 U.S. 378, 388 (1989). "The issue is whether the training program is adequate

17  and, if it is not, whether such inadequate training can justifiably be said to

18  represent municipal policy." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186

19  (9th Cir. 2006). "To allege a failure to train, a plaintiff must include sufficient facts

20  to support a reasonable inference (1) of a constitutional violation; (2) of a

21  municipal training policy that amounts to a deliberate indifference to constitutional

22  rights; and (3) that the constitutional injury would not have resulted if the

23  municipality properly trained their [sic] employees." *Benavidez v. County of San*

24  *Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021) (citing *Blankenhorn v. City of*

25  *Orange*, 485 F.3d 463, 484 (9th Cir. 2007)). "A pattern of similar constitutional

26  violations by untrained employees is 'ordinarily necessary' to demonstrate

27  deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563

28  U.S. 51, 62 (2011) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409

1    (1997)). However, a plaintiff can "prov[e] a failure-to-train claim without showing a

2    pattern of constitutional violations where 'a violation of federal rights may be a

3    highly predictable consequence of a failure to equip law enforcement officers with

4    specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting

5    *Brown*, 520 U.S. at 409); *see also Brown*, 520 U.S. at 409 ("The likelihood that

6    the situation will recur and the predictability that an officer lacking specific tools to

7    handle that situation will violate citizens' rights could justify a finding that

8    policymakers' decision not to train the officer reflected 'deliberate indifference' to

9    the obvious consequence of the policymakers' choice—namely, a violation of a

10   specific constitutional or statutory right.").

11        To adequately plead a *Monell* claim, the allegations in the complaint "may

12   not simply recite the elements of a cause of action, but must contain sufficient

13   allegations of underlying facts to give fair notice and to enable the opposing party

14   to defend itself effectively." *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d

15   631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

16   2011)) (holding the *Iqbal/Twombly* pleading standard applies to *Monell* claims). A

17   *Monell* claim survives a motion to dismiss only when the complaint "put[s] forth

18   additional facts regarding the specific nature of [the] alleged 'policy, custom or

19   practice.'" *Id.*

20        County Defendants argue the TAC fails to identify a County policy, a

21   longstanding County practice or custom, or a pattern of constitutional violations

22   related to untrained employees. (Dkt. 112-1 at 12–13). Plaintiffs argue the TAC's

23   allegations satisfy *Monell's* policy requirement by identifying the County's:

24   (1) practice or custom of providing inadequate custody and medical staffing at

25   ICRADF, (Dkt. 116 at 19–21); (2) practice or custom of providing constitutionally

26   inadequate direct-view safety checks, (*id.* at 22–23); and (3) failure to train its

27   custodial staff in suicide prevention and constitutionally adequate safety check

28   procedures, (*id.* at 21–22). The Court addresses the arguments in turn.

### 1.   Inadequate Staffing

Plaintiffs first argue the County is liable under *Monell* for constitutionally inadequate staffing, including inadequate medical staffing attributable to CFMG, its contracted healthcare provider. (Dkt. 116 at 19–21). Specifically, Plaintiffs argue there was custom or practice of providing inadequate custody and medical staffing that amounted to a deliberate indifference to Pichardo's serious mental health needs. (*Id.* at 20–21). State and local governments have duty to provide convicted inmates and pretrial detainees adequate medical care while in custody. *Gibson*, 290 F.3d at 1187–88 & n.9, *overruled on other grounds by Castro*, 833 F.3d at 1070. This includes a duty to provide adequate psychiatric care. *Gibson*, 290 F.3d at 1187. "Contracting out prison medical care does not relieve the State [or local government] of its constitutional duty to provide adequate medical treatment to those in its custody." *West*, 487 U.S. at 56. A custom or practice of delaying medical care can constitute deliberate indifference to a prisoner's constitutional rights. *See Oyenik*, 696 F. App'x at 794–95.

The TAC identifies, for the first time, seven instances when Pichardo's medical appointments were rescheduled over the course of more than eight weeks, from December 3, 2018 to January 29, 2019. (*See, e.g.*, TAC ¶¶ 22, 24, 30, 35, 36, 41 (appointments rescheduled due to time constraints); *id.* ¶ 29 (appointment rescheduled due to nurse calling out sick). The TAC also specifically alleges that: (1) ICRADF Watch Commander Colby Stewart and Imperial County Sheriff's Office Deputy Chief Jamie Clayton believed ICRADF had inadequate custody personnel staffing due to decisions by the County's Chief Executive Officer, (*id.* ¶ 66), and (2) CFMG Health Services Administrator Linda Corfman believed ICRADF had inadequate medical personnel staffing due to limitations in the contract negotiated by the County, (*id.* ¶ 67).

County Defendants, citing *Trevino v. Gates*, argue these allegations are "isolated and sporadic," and of insufficient "duration, frequency and consistency"

1   to constitute a "longstanding practice or custom" under *Monell*. (Dkt. 121 at 6

2   (quoting *Trevino*, 99 F.3d at 918)). However, the TAC doesn't simply identify a

3   single instance of a delayed appointment—it identifies seven over an eight week

4   period, and "[t]here is no case law indicating that a custom cannot be inferred from

5   a pattern of behavior toward a single individual." *Oyenik*, 696 F. App'x at 794. The

6   TAC also alleges that Pichardo's access to adequate psychiatric care was

7   substantially delayed and that, but for the inadequate staffing, Pichardo would

8   have received necessary care sooner. (*See* TAC ¶¶ 22–49 (describing Pichardo's

9   requests for psychiatric care and deterioration over time)). As discussed above, a

10  practice or custom of delaying access to medical care can constitute deliberate

11  indifference. *See Oyenik*, 696 F. App'x at 794–95. These allegations are sufficient

12  to plausibly allege a *Monell* violation based on inadequate staffing.

13                  **2.     Inadequate Safety Checks**

14          Plaintiffs next argue that the County is liable for under *Monell* for violating

15  Pichardo's right to direct-view safety checks. (Dkt. 116 at 22–23); *see Gordon*, 6

16  F.4th at 966–67 (recognizing pre-trial detainees "have a right to direct-view safety

17  checks sufficient to determine whether their presentation indicates the need for

18  medical treatment"). Specifically, they argue the County had a practice or custom

19  of failing to conduct safety checks every 60 minutes as required by Title 15 of the

20  California Code of Regulations, and that this practice or custom of

21  non-compliance was a moving force in denying Pichardo's right to direct-view

22  safety checks. (Dkt. 116 at 22–23); Cal. Code Regs. tit. 15, § 1027.5 (requiring

23  safety checks every 60 minutes).

24          The TAC's new allegations identify ten safety checks that exceeded

25  Title 15's 60-minute window during the eleven hours leading up to Pichardo's

26  suicide. (*See* TAC ¶ 73). The TAC also alleges that a Board of State and

27  Community Corrections audit conducted on April 28, 2019—two months after

28  Pichardo's death—revealed that safety checks at ICRADF were "still not being

1   routinely completed within the required 60-minute time frame." (*Id.* ¶ 76). County

2   Defendants argue that alleged violations of Title 15 are "isolated and sporadic,"

3   and of insufficient "duration, frequency and consistency" to constitute a

4   "longstanding practice or custom" under *Monell*. (Dkt. 121 at 6 (quoting *Trevino*,

5   99 F.3d at 918)). This argument fails in the face of the TAC's detailed allegations

6   regarding the County's failure to comply with Title 15's requirements, especially

7   the allegation that the April 28 audit found a continuing failure to comply with

8   Title 15 for the two months following Pichardo's death.

9          The TAC's allegations strongly support the inference that the County had a

10   practice or custom of failing to conduct Title 15-compliant safety checks that was

11   "of sufficient duration, frequency and consistency that the conduct has become a

12   traditional method of carrying out policy," *Trevino*, 99 F.3d at 918; that the

13   non-compliance was deliberately indifferent to Pichardo's rights; and that the

14   non-compliance was a moving force behind the violation of Pichardo's rights. *See

15   also Oyenik*, 696 F. App'x at 794 ("While one or two incidents are insufficient to

16   establish a custom or policy, we have not established what number of similar

17   incidents would be sufficient to constitute a custom or policy.") (internal citations

18   omitted). These allegations are sufficient to plausibly allege a *Monell* violation due

19   to a practice or custom of failing to provide constitutionally adequate direct-view

20   safety checks.

21                    **3.    Failure to Train**

22          Plaintiffs also argue that the County is liable for under *Monell* for failing to

23   adequately train its custodial staff, and that this failure resulted in a violation of

24   Pichardo's constitutional rights. (Dkt. 116 at 21–22). The TAC alleges, among

25   other training failures, that the County didn't train its custodial staff on suicide

26   prevention, (TAC ¶¶ 77–79), or how to properly conduct Title 15 safety checks,

27   (*id.* ¶¶ 72–76). County Defendants argue that Plaintiffs haven't alleged sufficient

28   facts to demonstrate that the alleged training failures constitute deliberate

1   indifference as required by *Monell*. (Dkt. 121 at 6–7). However, while "[a] pattern

2   of similar constitutional violations by untrained employees is 'ordinarily necessary'

3   to demonstrate deliberate indifference for purposes of failure to train," *Connick*,

4   563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409), a plaintiff can "prov[e] a

5   failure-to-train claim without showing a pattern of constitutional violations where

6   'a violation of federal rights may be a highly predictable consequence of a failure

7   to equip law enforcement officers with specific tools to handle recurring

8   situations.'" *Long*, 442 F.3d at 1186 (quoting *Brown*, 520 U.S. at 409).

9          As the TAC points out, "[s]uicide prevention training is critical in the

10  correctional profession." (TAC ¶ 77). More importantly, the TAC also alleges that

11  other inmate suicides and suicide attempts occurred in County jails, (*see id.*

12  ¶¶ 90–93), and that the County was aware of inmate suicides in jails in other

13  counties where CFMG provided medical care, (*id.* ¶¶ 94–99). These allegations

14  strongly support the inference that inmate suicides were a "highly predictable

15  consequence of a failure to equip [correctional] officers with specific tools to

16  handle" suicide risk in a correctional facility. *Brown*, 520 U.S. at 409. The TAC's

17  allegations that the County failed to provide any suicide prevention training

18  sufficiently state a failure to train claim "without a showing of a pattern of

19  constitutional violations." *See Long*, 442 F.3d at 118.

20                              *    *    *

21         In sum, the TAC adequately states a claim for *Monell* liability against the

22  County.[1] County Defendants' motion is **DENIED** as to the TAC's *Monell* claim.

23  //

24  //

25

26  [1] Plaintiffs also argue that the County is liable under *Monell* for failing to conduct
    an adequate investigation into Pichardo's death. (*See* Dkt. 116 at 23–24).
27  Because the TAC contains sufficient allegations to support a *Monell* claim, the
28  Court declines to address this argument.

**IV.     CONCLUSION**

The Court **DENIES** CFMG's motion to strike portions of the TAC, and **GRANTS IN PART** and **DENIES IN PART** County Defendants' motion to dismiss the TAC. All claims against Loera are **DISMISSED WITH PREJUDICE**. The County shall answer the TAC by **July 3, 2023**. Any renewed motions for summary judgment shall be filed by **July 10, 2023**.

**IT IS SO ORDERED**.

Dated:  June 26, 2023

_____
**Hon. Larry Alan Burns**
United States District Judge

20-cv-1465-LAB-DDL